## CITY OF GLADSTONE v. THROOP.

(Circuit Court of Appeals, Sixth Circuit. December 3, 1895.)

### No. 273.

1. MUNICIPAL CORPORATIONS—MICHIGAN STATUTES.

   The Michigan statute of 1875, granting and defining the powers of villages (How. Ann. St. c. 81), applies to villages incorporated after its passage, under the general act of 1857 for the incorporation of villages, as well as under special acts, and, as to such villages, supersedes the provisions of the act of 1857.

2. SAME—BONDS—VALIDITY.

   The village of G., Michigan, had power, under the statutes of that state, to grade and improve streets, to assess the cost of such improvements upon abutting property, and to issue bonds in anticipation of the collection of such assessments, which, when collected, should be applied in payment of the loan. The village directed the paving of a certain street, and assessed the cost of the improvement on the abutting property; but no preliminary resolution was passed fixing the improvement and assessment district, the assessment was never confirmed by a two-thirds vote of the trustees, and other formalities required by statute were neglected in making the assessment. Subsequently, after the acceptance of the work, and in order to pay the contractor, the village issued bonds, used a part of the money received from the sale in paying the contractor, and, having paid him the balance due from the proceeds of the assessments, used the remainder of the proceeds of the loan in paying certain other bonds which were properly chargeable to its general fund. *Held*, that the failure to comply with the formalities in making the assessment, though it might have rendered the assessment void if objected to by property owners, constituted no defense to the bonds; such assessment having been collected and the proceeds thereof or of the bonds having been diverted to an improper purpose.

**3. SAME.**

*Held,* further, that in the absence of evidence of the assessed value of the property in the assessment district it would be presumed, in support of the validity of the bonds, that a statutory limitation of the assessment to 5 per cent. of such value had not been exceeded, it appearing that the total valuation of the village was such that 5 per cent. thereof would largely exceed the amount of the bonds, and that more than the amount of the bonds had been collected from the assessment without objection.

**4. SAME—DEFENSES.**

A failure to comply with a requirement of the statute authorizing the issue of bonds by a municipal corporation, that such bonds shall state on their face the class to which they belong. does not constitute a legal defense to an action on such bonds when they represent a valid indebtedness.

**5. SAME.**

It is no defense, to an action upon bonds of a municipal corporation in the hands of an assignee without notice, that an illegal contract was made for the payment of a commission upon the sale of such bonds to an officer of the corporation, the first purchaser thereof, such commission never having been actually paid.

**6. SAME—AUTHORITY TO BORROW MONEY.**

When a municipal corporation is authorized to borrow money for the prosecution or completion of a public work, a loan effected after the completion of the actual work, in order to comply with the contract of the corporation with the persons who did it, is within the spirit and meaning of the statute giving such authority.

In Error to the United States Circuit Court of the Western District of Michigan.

This was an action by Benjamin H. Throop against the city of Gladstone to recover the principal and interest on five bonds, each of which was of the form following:

"United States of America, State of Michigan, Village of Gladstone.
"No.  $2,000.00.

"One year after date, for value received, the village of Gladstone promises to pay to Exchange Bank, Gladstone, or bearer hereof, the sum of two thousand dollars, in lawful money of the United States, at the office of the village treasurer of the said village, with interest at the rate of seven per cent. per annum, payable semiannually, as shown by and upon the annexed coupons, as they severally become due. This bond is one of a series of five bonds of like tenor and date, issued for the purpose of raising money for the payment of local improvements, voted by the legal qualified voters of the said village, at the annual election of the said village, duly called and held on the 6th day of March, A. D. 1888, and in conformity with Act 62 of the General Laws of 1875. The faith and credit of the village of Gladstone are hereby pledged for the punctual payment of the principal and interest of this bond. In testimony whereof, the undersigned officers of the village duly authorized to execute this obligation in its behalf have hereunto set their signatures this first day of November, A. D. 1888.

"(The Village of Gladstone. Incorporated 1887. Delta Co., Mich.)
"Jas. J. Miller, Village President.
"Attest: Robert W. Davies, Village Clerk."

Attached to each bond was a coupon for six months' interest. The defendant, the city of Gladstone, which had succeeded to the obligations of the village of the same name, made the defense that the bonds were void because issued without statutory authority and without the necessary vote of the people. The plaintiff had paid full value for the bonds before they fell due, without other notice of the circumstances of their issuance than what was contained in the recital of the bonds, and in the following certificate of the village clerk:

"**Office of the Village Clerk.**

"Gladstone, Mich., Nov. 1st, 1888.

"Certified copy of proceedings of the village council as to their authority and the regularity of issuance of bonds to pay for local improvements:

" 'Council Meeting, Feb. 13th, 1888.

" 'On motion the petition for paving both Delta and Minnesota avenues, signed by property owners, was adopted, and it was resolved that the question of bonding the village for the sum of ($15,000) fifteen thousand dollars for the purpose of raising funds for paving and curbing be submitted to a vote of the people as soon as may be, and in accordance with the laws of the state of Michigan. Said bonds to bear interest at the rate of seven (7 %) per cent. per annum, payable semiannually, at the office of the village treasurer of Gladstone.'

" 'Council Meeting, March 6th, 1888.

" 'Result of election as to paving Delta and Minnesota avenues and issuing bonds to the amount of ($15,000) fifteen thousand dollars was presented, and same ordered filed. Vote standing: "For bonds, 135; against bonds, 28." '

" 'Council Meeting, March 19th, 1888.

" 'Moved by Trustee Wilson that the expense of paving Delta avenue be assessed to the abutting property by the assessor at the time of the regular assessment, and that the same be spread upon the tax roll and collected at the same time and manner as the general tax. Carried. Call of ayes and nays.'

" 'Council Meeting, Oct. 29th, 1888.

" 'Moved by Trustee Allen that the pavement of Delta avenue be accepted from D. J. Kennedy, contractor. Carried.'

" 'Council Meeting, Oct. 30th, 1888.

" 'On motion of Trustee Buchanan, the committee of five, of which the president is chairman, appointed to arrange for funds with which to pay D. J. Kennedy, contractor of Delta avenue pavement, is hereby authorized to issue ($10,000) ten thousand dollars of bonds, being five bonds of ($2,000) two thousand dollars each, payable in one year after November 1st, 1888, bearing interest at seven per cent. per annum, payable semiannually, same bonds to be signed by the village president, attested by the clerk, whose actions are hereby confirmed. Carried on call of ayes and nays.'

"I hereby certify that the foregoing is a true and correct copy of the proceedings of the village council as appears from the records.

"[Village Seal.]       Robert W. Davies, Village Clerk."

The facts shown by the village records were as follows: The village of Gladstone was incorporated in November, 1887, under the general provisions of chapter 82 of Howell's Annotated Statutes, which was enacted in 1857 and entitled "An act for the organization and incorporation of villages." In February, 1888, a petition of property owners was filed with the council asking that Delta avenue be paved. The petition was accepted, and an ordinance for paving the street was passed. In March, council passed a resolution assessing the expense of paving Delta avenue to the abutting property holders, same to be spread on tax roll and collected at same time and manner as general tax roll. Bids were advertised for, and the bid of Kennedy was accepted. The contract was made accordingly in May. In July the assessment roll was approved and placed in hands of marshal for collection. An additional assessment of two dollars was imposed on lots abutting on Delta avenue. The work was done and accepted on October 29th. On October 30th, at a meeting of council where all members but one were present, a committee was appointed to arrange to secure funds to pay contractor, and authority was given to issue the five bonds of $2,000 each here in suit. The bonds were sold to one McKinney, who was cashier of Exchange Bank, and also treasurer of the board, with an agreement to pay him 5 per cent. commission, which never was in fact paid. The money for the bonds was paid: $4,000, November 23, 1888; $2,000, January 1, 1889; $2,000, February 1, 1889; $2,000,

February 28, 1889. There were collected from assessments: In December, about $10,000; in January, 1889, about $300; and in February, about $6,000. The total of assessments and proceeds from bonds amounted to $27,448.84. After paying the contractor what was due, there was left a balance of $6,069.- 43. This sum was devoted by the city council to take up $6,500, face value, of village bonds issued to pay for paving the street intersections on Delta avenue. These were a different series of bonds from that here in suit, and the circumstances of their issue were as follows: In February, when a petition from the property holders was filed in council praying for the improvement of Minnesota and Delta avenues, the committee to whom it was referred recommended that it be granted, subject to the action of the voters of the village in authorizing the issue of bonds to pay for the paving of the street intersections on both avenues. Accordingly the council granted the petition, and also resolved "that the question of bonding the village to the amount of fifteen thousand dollars for the purpose of raising funds for paving and curbing the street intersections in Delta and Minnesota avenues * * * be submitted to a vote of the village as soon as may be, and in accordance with the laws of Michigan. * * *" The council passed a resolution in favor of bonding the village for this purpose. The election was held on March 6, 1888, and resulted in a vote of 135 for the bonds and 28 against bonds. On June 4, 1888, the council passed the following resolution: "Whereas, it appears that the $15,000.00 of bonds authorized to be issued by this board by its resolution of February 13, 1888, is in excess of the amount allowed by the statute of this state: Therefore be it resolved, that instead of said amount there be issued bonds under the authority of the election held March 6, 1888, to the amount of $6,500 in lieu of the amount previously voted." The theory upon which this correction was made was that the power of the village in such a case was limited to an issue of bonds to be paid by general taxation, not to exceed 2 per cent. of the total assessed valuation of the property in the village, which was $379,800. These bonds were issued, and the proceeds were used to pay the amount due from the village to the contractor for intersections on Delta avenue. When they fell due, as already stated, instead of paying them by levying a general tax, as provided by law, the council ordered the treasurer to take them up with the $6,069.43 surplus in the Delta avenue paving fund created by the issue of the $10,000 of bonds here in suit. The certificate of the village clerk exhibited to the plaintiff was, therefore, incorrect, in the statement that the issuance of the $10,000 of bonds here in suit was voted for by the people. The vote was only upon the question of issuing intersection bonds. The learned judge at the circuit, at the close of the evidence, directed the jury to return a verdict for the plaintiff, on the ground that the council had authority to issue the bonds without a vote of the people, and that, even if the statutory requirements had not all been fulfilled to render the bonds valid as such, the village, and its successor, the defendant city, were liable for money had and received to its benefit from plaintiff's assignee.

Alfred P. Smith, for plaintiff in error.

Bowen, Douglas & Whiting, for defendant in error.

Before TAFT and LURTON, Circuit Judges, and SEVERENS, District Judge.

TAFT, Circuit Judge (after stating the facts). It is first necessary to determine which of the statutes of Michigan conferred and prescribed the powers of the village of Gladstone when the bonds here in question were issued. In 1857 the legislature of the state enacted a general law providing for the organization and incorporation of villages by county boards of supervisors. This law was amended in 1859, in 1863, and in 1869, and as thus amended was incorporated in the Compiled Laws, and in Howell's Annotated Statutes as chapter 82. It was under this chapter that the village of

Gladstone was incorporated in 1887. The chapter provided a mode by which, upon the petition of citizens living within the limits of the proposed village, any territory having not less than 300 inhabitants might be organized and incorporated into a village, with the powers defined in the act, and with boundaries fixed in the petition and approved by the supervisors. Power is given in section 2999 to the president and board of trustees to improve streets, and to provide for defraying the cost of the same by assessments upon the abutting property, "provided that no pavement of streets or highways shall be ordered or made until submitted to and approved by a majority of the legal voters of such village, expressed by ballot at a general village election or special election called for the purpose." This power was conferred by the amendment of 1859. No authority is given by chapter 82 to villages to borrow money or to issue bonds, and the bonds in suit were issued without lawful authority unless the provisions of chapter 81 of the same statutes have application to villages incorporated under chapter 82. Chapter 81 is merely the compilation of an act of the Michigan legislature, passed in 1875 and entitled "An act granting and defining the powers and duties of incorporated villages." It provides, in its first section, "that all villages hereafter incorporated shall be subject to the provisions of this act." As the village of Gladstone was incorporated after 1875, the inference would seem clear that it was subject to the provisions of the act; but the argument is pressed that by its subsequent sections the act of 1875 can only apply to villages incorporated by special act. Thus section 2 provides "that the boundaries of the village, the time and place for the first election therein, the time and manner of registering voters, and the manner of giving notice of such election shall be provided for by the special act incorporating such village." This language, it is insisted, excludes the application of the chapter to any villages but those incorporated by special act. But section 5 of the act repeats the very general language of the first section as follows:

"All villages hereafter incorporated shall be bodies politic and corporate under and by the corporate name assumed by or designated for them as hereinbefore provided and by such name may sue and be sued, contract and be contracted with, acquire and hold real and personal property for the purposes for which they were incorporated, have a common seal, and change its name at pleasure, and exercise all the powers in this act conferred."

We do not think that the words of section 2 can be held to qualify the very sweeping language of the first and fifth sections. All that section 2 was intended to declare was that the details mentioned therein were not to be fixed under this act, but under that act by which the particular village should be incorporated. Such details were fixed by the petition and approval of the board of supervisors in the case of villages incorporated under chapter 82 or the act of 1857. It must be borne in mind that Howell's Annotated Statutes of Michigan, as well as the Compiled Laws of 1871, were mere official compilations or arrangements of laws which took their force from their original enactment. Stewart v. Riopelle, 48 Mich. 177, 12 N. W. 36. They are not revisions, in which all the parts are to

be construed together as if passed together. The laws contained in them are to be treated exactly as if still in the books of Session Laws, and the later in date must prevail over that which is earlier, because it is the latest, and therefore the controlling, command of the legislature. We must not be confused, then, by the fact that chapter 82 and chapter 81 are printed in the compilation as though both are in force; for if they contain inconsistent provisions concerning the same subject-matter, the earlier must be deemed pro tanto repealed. People v. Hobson, 48 Mich. 27, 11 N. W. 771. The confusing character of this legislation concerning villages finds some explanation in its history. The act of 1857, with its amendments, providing for incorporation by the supervisors, and defining the village powers, obviously proved to be inadequate, and in 1873 (Laws 1873, p. 368, No. 179) an act was passed in which a somewhat more elaborate method of organizing villages by general laws was provided, and widely-extended powers were given to villages incorporated under the act, and ample opportunity was given to all villages theretofore organized to be reincorporated under the new law, and to acquire the new powers therein conferred. This act of 1873 was declared unconstitutional by the supreme court of Michigan, for the reason that its scheme for the incorporation of villages involved a legislative delegation to unofficial persons of the power to determine the boundaries and other important particulars of the village organization. The act of 1875 seems to have been a re-enactment, for the purpose of increasing the powers of all villages thereafter incorporated, under whatever law, of a large part of those chapters of the act of 1873 which described the powers of villages, without any attempt to provide a new mode of incorporation. In the hasty adaptation of the sections of the act of 1873 to the purposes of the act of 1875, words are permitted to remain in the various sections of the latter act that really have no place there, because that to which they referred in the former act is omitted in the latter. Thus, in section 5 of the act of 1875, already quoted, the corporate names of the villages are referred to as "assumed by or designated for them as hereinbefore provided." Now no previous provision for such an assumption or designation can be found in the act of 1875, but a reference to the act of 1873 shows that section 5 was taken bodily from the act of 1873, where can be found antecedent words to satisfy its meaning. But, however difficult to reconcile completely the words of certain sections of this act because of these peculiarities in its legislative growth, we have no doubt whatever that it was the intention of the Michigan legislature, both in passing the act of 1873, and in subsequently passing that of 1875, to enact a municipal code applicable to all villages subsequently incorporated, whether incorporated by special act or under the mode provided by the act of 1857. For the government of villages thereafter incorporated the act of 1875 must supersede that of 1857 in every respect where the two cover the same ground. The act of 1875, unlike that of 1857 and that of 1873, did not attempt to deal with incorporating villages by general law. Therefore the provi-

sions of the act of 1857 as to incorporation remained unaffected by that of 1875, but in other respects the act of 1857 in relation to villages organized after 1875 must be regarded as superseded.    The act of 1857 in all its parts must still remain on the statute book to govern villages incorporated before 1875, to which the act of 1875 had no application, and thus the one or two amendments to the act of 1857 which have been passed since 1875 have relation only to that class of villages.

It is well settled in Michigan, as elsewhere, that where a subsequent statute covers the whole ground occupied by an earlier statute, it repeals by implication the former statute, even where there is no repugnance.    Shannon v. People, 5 Mich. 71; Breitung v. Lindauer, 37 Mich. 217; Dewey v. Manufacturing Co., 42 Mich. 399, 4 N. W. 179; Feige v. Railroad Co., 62 Mich. 1, 28 N. W. 685; U. S. v. Claflin, 97 U. S. 546; Murdock v. Memphis, 20 Wall. 590; U. S. v. Tynen, 11 Wall. 88.    Under the act of 1875, c. 7, §§ 17–19, and chapter 8, § 3 (How. Ann. St. §§ 2863–2865, 2904), the board of trustees or council of the village is given power to pave streets and assess the cost thereof on abutting property without a vote of the people.    These provisions, though not repugnant to section 2999 of chapter 82, requiring a vote of the people to authorize paving streets, take its place, and remove the necessity for any such popular vote in all villages organized after the act of 1875 and subject to its provisions.    We have only to inquire, therefore, whether these bonds were issued in accordance with the requirements of the act of 1875, or chapter 81 of Howell's Annotated Statutes.

Section 2863 provides that the village council shall have authority to grade, pave, curb, and otherwise improve streets.    Section 2864 provides that the expense of such improvement may be defrayed by foot-front assessment, or in part from such assessment and in part from the general or special street fund of the village, and that the lots assessed by front feet shall constitute an assessment district.    Section 2864 provides that the village, out of the general highway fund, shall pay for street intersections and the frontage of village property as a private owner.    Section 2904 provides that when the council shall determine to make an improvement, to be paid in whole or in part by assessment, it shall so declare by resolution, stating the improvement, the proportions to be paid, respectively, by special assessment and by general taxation, and the lands or district to be assessed.    Section 2913 provides that if any assessment should prove insufficient to pay for the improvement the council might impose additional assessment within the limitations prescribed for assessments.    Section 2926 provides that the council may raise, by special assessment upon lands in special assessment districts, for the purpose of defraying the expense of paving and improving streets, charged upon the lands in proportion to frontage, such sums as they shall deem necessary to defray the costs of the improvements, but not to exceed in any one year 5 per cent. of the assessed value of the property in the district chargeable with the expense.    Section 2953 provides that the council by a two-

thirds vote may borrow, in anticipation of the collection of special assessments actually made for any local improvement, such sum, not exceeding the assessment, as may be necessary for the prosecution or completion of the improvement; and the assessment, when collected, shall be applied in payment of the loan. Section 2957 provides that, for any loans lawfully made, the bonds of the village may be issued, and that each bond shall show upon its face the class of indebtedness to which it belongs, and from what fund it is payable.

It is evident from this review of the statutes that the village council had authority, without a vote of the people, to order an improvement of Delta avenue, to assess its cost upon the abutting property holders, to borrow money in anticipation of the collection of valid assessments, and to issue bonds to evidence such a loan. There are certain steps enjoined in the levying of these assessments, and it is insisted by counsel for the plaintiff in error that they were not taken, that the assessment was accordingly invalid, and that the bonds were therefore void. Thus it is pointed out that under the statutes a special improvement, to be paid for by assessment, can only be ordered by a two-thirds vote of all the trustees elect, and that the ayes and nays must be spread on the journal; that no preliminary resolution was passed fixing the improvement and assessment district; that the assessment was never confirmed by a two-thirds vote; that the issuance of the bonds was had at a special meeting, called without proper statutory notice, when some trustees were absent. These objections to the validity of the assessments might be good if they had been made by those property owners who were assessed, but it is not shown that the assessments, or any of them, were defeated on these grounds. So far as appears, the village collected the assessments levied, and it cannot now be heard to plead the illegality of the assessments which it has collected as a reason for not paying the bonds which it issued in advance of the collection of such assessments. Dill. Mun. Corp. § 459; Argenti v. San Francisco, 16 Cal. 255. The evidence shows that the first $4,000 paid to the village by the purchaser of the bonds was used to pay the contractor; that then $17,000 of assessments was collected and paid the contractor; and that the remaining $6,000, paid by the purchaser of the bonds, was not used to pay the contractor, but remained in the treasury until taken to pay the intersection bonds, which should have been paid by general levy. It was plainly the duty of the council to have used $4,000 of the assessments to pay the first $4,000 of bonds, and to have retained the proceeds of the remaining $6,000 of bonds to take them up when they fell due. Clearly, the wrongful diversion of the assessments properly applicable to the bonds, and of the unexpended $6,000 also applicable to them, cannot enable the city to escape a liability lawfully assumed. The evident purpose of the law was that the credit of the whole city might be pledged to pay bonds, the proceeds of which should be used to anticipate assessments levied on a particular district, and that the city could thereafter relieve itself by using

the assessment returns to pay the bonds. If the city has failed to do this, when it had the power, the bondholders cannot be thereby prejudiced in the recovery of that which they advanced, in proper reliance upon the city's liability. The $6,000 of bonds which the city did not need assessments to pay, it used for another purpose to pay a lawful debt, which it ought to have paid by general taxation. Clearly, ex equo et bono, it owes this money to those from whom it came, and it cannot avoid its payment by any plea of want of power or regularity in obtaining it. Parkersburg v. Brown, 106 U. S. 487, 503, 1 Sup. Ct. 442, and cases there cited.

It is said the bonds were illegal because in excess of 5 per cent. of the assessed value of the property in the district. There is no evidence what the assessed value of the district was. It is in evidence that the total assessed value of the entire village was $379,-000, and 5 per cent. of that is $19,000. This leaves it entirely possible that that 5 per cent. of the abutting property on Delta avenue which constituted the assessment district much exceeded $10,000, and until it is otherwise shown to the contrary, it will be presumed, in support of the validity of the bonds, that this limitation was not exceeded. In any event, objection cannot be made by the village, after it has collected more than $10,000 in assessments, that the bonds were issued in excess of legal authority. The limitation applied to the assessments, not to the bonds, and was for the benefit of the abutters. If the abutters made no objection and paid the assessments, it is not for the city, when sued for bonds issued in lieu of assessments, to avoid their payment by a plea that was only for the abutters to urge, and which they waived.

A very technical argument is made to show that the village had no power to borrow money in advance of collecting the assessment unless the improvement was uncompleted. It is said that because here the work was done, the borrowing of money to pay the contractor at such a time could not be said to be for either the prosecution of the work or its completion, as required by statute. It seems to us that it was borrowed to comply with the contract of the village for the completion of the work, and so was within the spirit and meaning of the statute. The resolution under which the bonds were issued directed their issue to pay the contractor, and did not expressly recite that they should be issued in anticipation of assessments, but as there was no power to issue them except for this purpose, and as this was plainly what they were issued for, we cannot see why the village, and its successor, the city, should not be liable upon them as lawfully-issued bonds, even if the resolution giving them circulation was not drawn with legal accuracy.

A similar answer must be given to the defense that the bonds do not state upon their face the class of bonds to which they belong. Such a defect might be quite material in considering the liability of a city to a bona fide purchaser for value who relied on the apparent validity of the bond under the law to escape equitable defenses of the obligor, but here there is no defense to the debt which the bond evidences, and a technical compliance with the law in the form of the instrument becomes immaterial.

It is further objected that no recovery should be had for this debt, because the first purchaser of the bonds was the city treasurer, who was promised a commission of 5 per cent. for the sale, in the face of a statute which made it unlawful for any city or village officer to enter into a contract with the city or village, in which contract he was to receive from such city or village a valuable consideration. The commission promised in this case was never paid. Conceding the contract to pay the commission to have been unlawful and void under the statute, the sale of the bonds was nevertheless clearly separable from that for the commission, and it would be the grossest injustice to hold the city freed from the obligation of the bonds in the hands of an assignee who had paid value for them without notice, because their delivery and sale had been accompanied by an unlawful collateral stipulation with the first purchaser, as to a commission, which was never fulfilled.

On the whole case, we think the judgment of the court below was right, and it is affirmed.